UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

HONORABLE ANDREW J. GUILFORD, JUDGE PRESIDING; COURTROOM 10D

---

| | | |
|---|---|---|
| Samuel D. Ellsworth, et al., | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| | ) | |
| | ) | |
| vs. | ) | No. SACV 12-1499-AG(MLGx) |
| | ) | |
| | ) | |
| | ) | |
| American Home Mortgage Servicing, | ) | |
| Inc., et al., | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant(s). | ) | |
| | ) | |
| _____) | | |

REPORTER'S DAILY TRANSCRIPT OF PRETRIAL PROCEEDINGS
(TOTAL OF 35 PAGES)
SANTA ANA, CALIFORNIA
MONDAY, JULY 29, 2013

DENISE PADDOCK
COURT REPORTER

**A P P E A R A N C E S**

072913 DCCD GUILFORD 10D
SACV 12-1499-AG(HLGx)


**IN BEHALF OF THE PLAINTIFF:**

        **Joseph Richard Manning, Jr.**
        **Babak Hashemi, Esq.**
        The Law Offices of Joseph R Manning Jr. APC
        4667 MacArthur Boulevard, Suite 150
        Newport Beach, CA 92660
        949-200-8755
        Fax: 866-843-8308
        Email(s): manningjr@aol.com


**IN BEHALF OF THE DEFENDANT:**

        **Libby Wong**
        Smith Dollar, PC
        404 Mendocino Avenue, 2nd Floor
        Santa Rosa, CA 95401
        707-552-1100
        Fax: 707-552-1101
        Email(s): lwong@smithdollar.com

```
 1                    SANTA ANA, CALIFORNIA; MONDAY, JULY 29, 2013

 2                    THE CLERK:  Calling calendar Item 5,

 3        SACV 12-1499-AG(MLGx): SAMUEL D ELLSWORTH, ET AL. V.

 4        AMERICAN HOME MORTGAGE SERVICING, INC., ET AL.

 5                    Counsel, appearances, please.

 6                    MR. MANNING:  Good morning, Your Honor.

 7                    Joseph Manning for Plaintiffs Sam Ellsworth and

 8        Robin Ellsworth.

 9                    MR. HASHEMI:  Good morning, Your Honor.

10                    Babak Hashemi appearing on behalf of the plaintiffs

11        as well.

12                    MS. WONG:  Good morning, Your Honor.

13                    Libby Wong on behalf of Defendants

14        Homeward Residential and Power Default Services.

15                    THE COURT:  Okay.

16                    Welcome to you all.

17                    Have you seen the tentative?

18                    MR. MANNING:  Yes, Your Honor.

19                    MR. HASHEMI:  Yes, Your Honor.

20                    THE COURT:  All right.

21                    It's good to see you, Mr. Manning.

22                    What are your thoughts?

23                    This is a difficult case for me.

24                    Frankly, we've been dealing with these cases since,

25        what?, 2008.
```

1          This, actually, I must say -- we need you over on

2     the defense side.

3          I must say, Mr. Manning, this is the first time

4     it's come down to fees, and we have been dealing with these

5     cases for five years.

6          You've been dealing with these cases for five

7     years.

8          MR. MANNING:  Yes, Your Honor.

9          THE COURT:  You've been before -- your firm's been

10    before our court.

11         I've rarely seen you.

12         I've seen your colleague, who has come in.

13         And I want to do what is right here.

14         As a say, this is the first time this issue of

15    "fees" has been framed in the context of what has been called

16    "the foreclosure crisis"; and after five years, I'm forced to

17    review this issue.

18         The factors that concern me here is I did tell you

19    to give me a declaration that Rule 11 had been complied with.

20         Now, one of the ongoing issues we have in

21    foreclosure cases is that the plaintiff files in state court,

22    it gets removed to federal court, and I'm not sure whether

23    the plaintiff thereby automatically certifies under Rule 11.

24         I don't think so.

25         So that's why I just have a standard order that

1    asks you to certify that now you're in federal court Rule 11

2    has been complied with.

3            You didn't bother to answer that question under

4    oath as awarded -- as ordered.

5            I am wondering, in this case, whether -- what is

6    the present situation with the property?

7            MR. MANNING:  Well, Your Honor, the plaintiffs

8    continue to reside in the property.

9            The servicing rights to the property have been

10   transferred to a new servicer, and the plaintiff is dealing

11   directly with the new servicer.

12           THE COURT:  All right.

13           What's the state of the loan?

14           MR. MANNING:  The loan -- the loan continues to be

15   accelerated; and, therefore, the servicer will not accept

16   payments, and the efforts are being made by the plaintiffs to

17   come to an arrangement with the servicer whereby they can

18   start making payments again.

19           THE COURT:  How much equity is there?

20           MR. MANNING:  Zero equity, Your Honor.

21           It's a family home and, hence, the plaintiffs'

22   strong desire to keep the property.

23           THE COURT:  All right.

24           Is it correct, then, under California

25   antideficiency legislation that your client is, basically,

1    living in a rather nice home without any housing expense for

2    a significant amount of time with -- leaving the bank with no

3    chance to recover for that?

4            MR. MANNING:  It is potentially so, Your Honor.

5            THE COURT:  Is that a concern the court should

6    have?

7            MR. MANNING:  The one point I would make,

8    Your Honor, because there's no restraining order or other

9    injunctive relief in place, nor has there been since the case

10   has removed from state court, that the defendant has -- has

11   and has at all times had the ability to foreclose on the

12   property and sell it.

13           THE COURT:  Okay.  What about that?

14           I'm asking the defense.

15           Why did you not just foreclose, monetize your asset

16   and move on?

17           MS. WONG:  I can't really speak to that issue.

18           I'm not really sure.

19           THE COURT:  Well, you should be able to speak to

20   that issue.

21           These are important questions.

22           I mean, do you understand my question to the

23   plaintiff about whether he's been living in the house,

24   essentially, with no housing expenses for a significant

25   amount of time?

```
 1                    MS. WONG:  Right.

 2                    THE COURT:  And do you understand his response is,

 3          it's your fault, you didn't foreclose?

 4                    Do you find any irony in that?

 5                    And why don't you -- you can walk around and get

 6          right in front of the microphone.

 7                    MS. WONG:  Okay.

 8                    THE COURT:  No.

 9                    Come all the way around.

10                    Pull the chair out.

11                    Pull the microphone all the way close to you.

12                    All the way.  Keep pulling.

13                    Even more.  Even more.

14                    Then you don't have to get a kink in your back.

15                    Do you understand the irony in that?

16                    MS. WONG:  I -- I don't know all the reasons set

17          forth as to why the foreclosure hasn't taken place.

18                    I know -- it's my understanding that the plaintiffs

19          have been residing at the property for quite some time

20          without making mortgage payments.

21                    THE COURT:  Which again underscores the point, why

22          didn't you foreclose on them?

23                    MS. WONG:  I would imagine it's -- it's due to this

24          litigation.

25                    But, I'm sorry, I just can't speak to that issue
```

1     right now.

2              THE COURT:  Okay.

3              Other factors that have affected me, Mr. Manning,

4     is that there is some pretty powerful statements in the

5     record that your client is making $20- or $30,000 a month, or

6     you even said that the reason they're seeking fees is because

7     of "jealousy of Plaintiffs' financial status."

8              Well, that cuts two ways.

9     We have a -- is it true the defendant is making 20- or

10    30,000?

11             MR. MANNING:  Yes, Your Honor.

12             He has, at times.

13             He's a -- essentially -- and this explains the

14    default, originally -- he's been in the mortgage business and

15    his -- the business, essentially, tanked.

16             He was, for all intents and purposes, unemployed

17    and unable to earn a living.

18             With -- in the recent past with the -- something of

19    a revival of the housing market and low interest rates, his

20    income has returned somewhat, and that's something that at

21    the three mediation -- three ADR conferences that were

22    conducted in this case, that we, you know, suggested as a way

23    that he could afford to make payments.

24             He's not -- if he wanted to make a payment now, he

25    cannot make a payment, because the loan's been accelerated;

1    but he's ready, willing and able to make a payment.

2           THE COURT:  But antideficiency legislation in

3    California probably means he will have had the -- a nice home

4    rent-free and mortgage payment-free for quite some time --

5    correct? -- without the prospect, requirement, obligation,

6    duty or whatever of ever paying that housing expense.

7           MR. MANNING:  Correct.

8           Yes.  To -- however, the antideficiency statute

9    only applies in the event of a nonjudicial foreclosure.

10          Because this is a refinance --

11          THE COURT:  Okay.  This is nonpurchase money.

12          And, of course, again you can put it back on the

13   defense, but I'd say it's about 99 percent of the time we go

14   to nonjudicial foreclosure.

15          MR. MANNING:  Yeah.

16          THE COURT:  And the equity of redemption is a

17   powerful force squeezing these things into nonjudicial

18   foreclosures, the equity of redemption existing in judicial

19   foreclosures.

20          Okay.  And by the way, this issue of antideficiency

21   protection, actually, is something I wondered if you were

22   going to raise, that if you allow lenders to vigorously come

23   in under "1927" or otherwise, isn't that a violation of

24   antideficiency protection?

25          That's an argument on your behalf that I'm

1        making for you.

2                    MR. MANNING:  As Your Honor knows, based on the

3        papers, I had not considered that.

4                    I think that the -- that is an argument that could

5        be made by the plaintiff.

6                    THE COURT:  In your papers you mentioned -- I'm not

7        sure why -- you mentioned that you need to get a conflict

8        waiver in your early meeting with the plaintiff.

9                    MR. MANNING:  Right.

10                   That --

11                   THE COURT:  Go ahead.

12                   MR. MANNING:  That goes -- although I'm informed

13       that they've reconciled, the plaintiffs were in the process

14       of divorcing at the time that they retained me.

15                   And so because there was a -- I believe there was

16       an actual marital proceeding underway, although I don't know

17       the precise status, I elected to have each Plaintiff come in

18       and meet with me individually and sign a conflict waiver in

19       the event that they were asked to enter into some sort of

20       financial commitment that they would understand that there's

21       a potential conflict, especially given that there may be

22       separation of assets.

23                   My understanding is that that is no -- that they

24       have reconciled and that's no longer at play.

25                   THE COURT:  Okay.

1          All right.

2          As I say, this is -- this is the first time the

3   dozens, maybe hundreds of foreclosure cases I've had since

4   2008 have come to such a fee request.

5          Has any other court imposed fees on your offices in

6   these foreclosure cases?

7               MR. MANNING:  No, Your Honor.

8               THE COURT:  Wow.

9          I was actually hesitant to ask that question for

10  fear you'd give an embarrassing answer.

11         That's a powerful statement.

12         It never happened?

13              MR. MANNING:  In fact, there's never been a

14  request.

15              THE COURT:  I -- this isn't directed at you.

16         This is directed at the "crisis."

17         That amazes me that there's never been a request.

18  It's been going on for five years.

19  You know, I have heard of the phenomena -- and I don't

20  attribute it to you -- but the phenomena of attorneys in your

21  position saying, give me $3,000, I'll file the complaint,

22  I'll not answer the motions to dismiss, but I'll get three

23  chances, you'll get six months, it will cost you $3,000,

24  let's go.

25  Again, I have no evidence that that's what you're doing; but

1     it's things like that that cause me a little concern about

2   what goes on here, because of course we process the three

3   motions to dismiss, we analyze them, we issue our order, and

4   I have to say, I have been amazed at the infrequency with

5   which a righteous claim gets asserted.

6   It's, partly, the *Gomez* case.

7   Is it "Gomez"?

8   "Lopez"?  *Gomes.*

9           MR. MANNING:  *Gomes* with an "S."

10          It could be.

11          THE COURT:  It's partly the *Gomes* case, but I'm

12  just surprised over these five years, Mr. Manning, the

13  infrequency with which a claim gets asserted.

14          There's the truth-in-lending, you know, possible

15  requirement of putting the money up.

16          I think there's clever ways of getting around that,

17  none of which I've ever seen presented in my court.

18          So there we have it.

19          I've told you, now, some of my concerns.

20          And tell me what you have to say; and tell me, if

21  we were to award fees, whether it should be against counsel

22  or your client.

23          So all of that.

24          MR. MANNING:  Yes, Your Honor.

25          THE COURT:  What do you have to say

1    about the tentative?

2              MR. MANNING:  Absolutely.

3              As an initial matter, the tentative indicates that

4    I did not file a declaration in response to the chamber's

5    directive.

6              THE COURT:  Answering the question we had, that is,

7    that under Rule 11, under penalty of perjury, I certify that

8    all of these claims are sufficiently supported under my

9    requirements of Rule 11.

10             MR. MANNING:  Yes, Your Honor.

11             THE COURT:  I don't think you answered that

12   question.

13             MR. MANNING:  I do not believe I did.

14             And -- and -- and I'm -- just my explanation, my --

15   I read that order, I believe, incorrectly to be asking why

16   and whether I believe --

17             THE COURT:  You were going to a jurisdictional

18   basis.

19             MR. MANNING:  Yes, Your Honor.

20             THE COURT:  And if you read it -- if you read it,

21   we wrote it going to both, and it's because of the problem.

22             I would guess you have had dozens of your state

23   court cases removed to federal court; so there you are

24   sitting in federal court with either a good complaint or what

25   often turns out to be a complaint that doesn't survive

1    12(b)(6), and you've never really made a Rule 11

2    certification.

3              So that's why in these cases I just ask you right

4    off.  I understand your confusion that you thought I was

5    trying to assert jurisdiction, which becomes very odd for you

6    to be asserting that there's jurisdiction.

7              MR. MANNING:  And, in fact -- and, in fact, in my

8    declaration in the pleading attached, I asserted that I did

9    not believe there was jurisdiction; and I think in an

10   abundance -- the order also said that if I did not want to be

11   in federal court, I ought to just not respond and it would be

12   remanded or dismissed without prejudice -- I think it was --

13   and I thought, in an abundance of caution, I should respond.

14             THE COURT:  Well, I'm not sure that's what it says,

15   and it does -- it asks two things.

16             If you are the plaintiff that doesn't want to be

17   here, it does ask you to say that there's a Rule 11 basis for

18   the claims you're asserting that Defendant claims gets you

19   here.

20             That is to say, if you threw in a funky, worthless,

21   truth-in-lending allegation, I need you to tell me that it

22   meets Rule 11; and if it doesn't meet Rule 11, you'll go back

23   to state court.

24             So it's actually just asking you to confirm that

25   the claims that the defendant is using for federal

1    jurisdiction you stand behind in a Rule 11 context.

2            Not that you stand behind federal jurisdiction, but

3    that the claim you asserted -- and I always wonder, if you

4    guys don't want to be in federal court, why do you throw in

5    the TILA?

6            MR. MANNING:  And, in fact, in this case there was

7    a diversity.

8            THE COURT:  And I don't know if this is TILA.

9            I was just going to say, and then there is the

10   diversity issue.  Okay.

11           MR. MANNING:  Right.

12           And -- and -- and I'm not suggesting, by talking

13   about the order, that I believe that I'm not subject to

14   Rule 11.

15           I'm just, one, wanting to clarify that you were

16   aware that I did file a declaration.

17           THE COURT:  And I -- I accept your statement that

18   you were confused.

19           I understand that confusion.

20           I just want you to know where we're coming from in

21   asking for that.

22           Somewhere along the line someone needs to make a

23   Rule 11 certification.

24           Less so in a case that isn't the amorphous TILA

25   allegation that gets you here.

1          If it's the diversity allegation, it's a different

2     context; often, me deciding whether Wells Fargo Bank is a

3     South Dakota entity or some crazy thing.

4          Go ahead.

5          Next, in response to my order.

6          MR. MANNING:  Yes, Your Honor.

7          And then with respect -- just to kind of walk the

8     court through the evolution of this case, initially, as you

9     know, the case was filed in state court, and I was retained a

10    few weeks before the scheduled trustee sale.

11         I did interview both clients.

12         I specifically looked at the notice of default.

13         Attached to the notice of default in this case

14    there's a declaration of compliance; and, in this case, it's

15    a little different.

16         Although the defendant is not required -- or the

17    foreclosing party is not required to, they actually specify

18    when they made phone calls and the dates that they mailed

19    the -- the letters that they're required to mail.

20         And that's unusual.

21         So at that point I was satisfied --

22         THE COURT:  Okay.

23         At that point, let me say -- this is going to be an

24    argument in your favor -- at that point I'm not sure Rule 11

25    requires you to say to your client, your life was in

1      disarray, did you ever set letters aside and not open them?

2              As I recall, the settlement judgment largely turned

3      on that.

4              When your guy is saying, I didn't open all my

5      letters, you can't be saying, I didn't get notices.

6              To your benefit, I don't think Rule 11 requires you

7      to say, your life was in disarray, are you certifying to me

8      that you opened all your letters?

9              MR. MANNING:  And -- and I suppose it can be

10     interpreted either way.

11             I didn't -- that didn't occur to me.

12             THE COURT:  I'm giving you that.

13             MR. MANNING:  Thank you.

14             THE COURT:  I gotcha.

15             MR. MANNING:  Okay.  So at that point we go into

16     state court, we were given a 90-day stay order and then the

17     case is removed.

18             THE COURT:  Well, no, there was a foreclosure that

19     you set aside, wasn't there?

20             MR. MANNING:  Correct.

21             Yes, Your Honor.

22             THE COURT:  Go ahead.

23             MR. MANNING:  Actually, so the stay order was put

24     into place.  The foreclosure went ahead after it was served.

25             THE COURT:  Oh my goodness, yes.

1              Ooh, talk about "bad faith."

2         MR. MANNING:  It was rescinded.

3         THE COURT:  Did you ever sue them for wrongful

4    foreclosure, violation of an order?

5         MR. MANNING:  Your Honor, we did not, because we

6    went into court -- they stipulated or they agreed that they

7    had done -- they had sold the property in error and they

8    quickly rectified it.

9         THE COURT:  Okay.

10        MR. MANNING:  And so we chose -- because,

11   ultimately, part of the psychology of the case, from our

12   perspective, is we need -- we ultimately need to work

13   something out with -- with the bank.

14        THE COURT:  Okay.

15        MR. MANNING:  The 2923.5 remedies are limited, and

16   so we are walking a fine line of -- we want to work something

17   out.  We want to settle the case.

18        THE COURT:  Yeah.

19        Justice Sills gave and he taketh away with *Mabry*.

20        MR. MANNING:  Yes.

21        THE COURT:  *M-a-b-r-y*.

22        Go ahead.

23        MR. MANNING:  Correct, Your Honor.

24        And so when the case was ultimately -- was removed,

25   at that point we don't have -- we haven't -- we have no -- we

1    have no answer or we haven't had an opportunity to do

2    discovery.

3            I don't have any indication that the case is not

4    supported; and I -- and I contend that it is supported by

5    probable cause and merit and so forth and is brought not for

6    a dilatory purpose or for any other improper purpose -- and

7    I'll get to that -- and so at that point --

8            THE COURT:  Can I just ask you this -- and I'm not

9    saying this is relevant -- and a unique thing about this

10   case, which probably acts in your favor, is we didn't have a

11   series of 12(b)(6)s.

12           If I were to suggest the batting average of your

13   office -- and your colleague here does a good job -- but the

14   batting average of your office on 12(b)(6)s is probably

15   5 percent?  Ten percent?

16           You lose a lot of 12(b)(6)s; right?

17           MR. MANNING:  Yes.  Yes, Your Honor.

18           THE COURT:  Okay.

19           And this court always gives three chances, and a

20   lot of delay, a lot of work on this court issuing tentatives

21   of 10 to 15 pages in length, looking to see if this will be

22   the one unique case I've been looking for since 2008 that

23   will viably state a claim that gets around *Gomes,* et cetera,

24   et cetera.

25           So this case did not involve 12(b)(6)s, which maybe

```
 1        operates in your favor, because the court has gotten a little

 2        frustrated to handle -- you know, if we handle a hundred

 3        12(b)(6)s in mortgage cases, including your firm and many

 4        others, it's a 95 percent success rate for the defendant,

 5        which I find is typical across the board.

 6                  It's not just me being tough on 12(b)(6)s.

 7                  It goes to Judge Frank Firmat at the state court,

 8        who I think has a lot of understanding of the plight of the

 9        plaintiffs, and it goes to many others.

10                  And so we didn't get into a 12(b)(6) battle.

11                  Go ahead.

12                  MR. MANNING:  That's correct, Your Honor.

13                  The --

14                  THE COURT:  And I only say that because you said

15        you made a determination that you had a viable claim.

16                  Okay.

17                  MR. MANNING:  I believed and believe we do -- or

18        did have a viable claim prior to the MSJ.

19                  The -- the -- and Your Honor's correct that the

20        case was answered.

21                  I might say, you know, we -- we are successful in

22        getting -- in passing the pleading stage in, you know, many,

23        many cases in -- in state court.

24                  I view the Gomes case as a case that has a sort of

25        built-in -- it was sort of a declaratory relief case, without
```

1    asserting any -- any wrongful conduct, which I thought was

2    the "flaw" in the *Gomes* case; and that the footnote, which

3    basically says, you know, if you had suggested something, we

4    might have looked at it, but we're not just going to open the

5    case up and do sort of an inspection of this foreclosure.

6            THE COURT:  Okay.  Gotcha.

7            Good points.

8            MR. MANNING:  So anyway, Your Honor, once -- once

9    in federal court, we begin the process.

10           We received initial disclosures from the defendant.

11           We -- we made an exchange, I should say.

12           We received the defendants' initial disclosures on

13   December 3rd.

14           Interestingly, on review of the initial

15   disclosures, what I did not find in the initial disclosures

16   were the letters referenced in the documentation of

17   compliance included in the declaration of compliance attached

18   to the notice of default.

19           To me that supported our claim, because that was

20   contemporaneous; and there's a declaration from a

21   vice president of the foreclosing party stating that,

22   basically, this is how we complied, this is what we did and

23   this is when we did it.

24           The -- it talks about a letter sent on January 17,

25   another letter sent on February 7.

1      Those letters were not part of the initial

2   disclosures.

3      At that point, I believe that's a -- a -- a fact

4   that is helpful to -- to our case and supports the case that

5   we have.

6      At the time when the motion for summary judgment

7   was filed, as part of the motion for summary judgment the

8   December 7 letter is referenced in the declaration of

9   Cindy Ellis; however, it's not attached, and there's no

10  explanation of that.

11     The letter that is attached, the initial letter

12  that would seek to comply with 2923.5 (e), which is the due

13  diligence prong, that letter is dated January 19th.

14     The declaration of compliance, documentation of

15  compliance, talks about a letter sent on January 17.  So

16  that's a letter that wasn't created until after the letter

17  was -- in the documentation of compliance was sent, and

18  that's contemporaneous -- attested to by the vice president

19  for -- either for the defendant or an entity for whom --

20  dealing with the defendant in the foreclosure process.

21     THE COURT:  I am not sure the arguments you are

22  making were as succinctly and effectively stated in your

23  opposition to the summary judgment.

24     MR. MANNING:  And Your Honor's correct, they were

25  not.

1    And so -- and what I'm talking about right now is

2    the -- our belief in the meritorious claim, and there's a

3    reason for that.

4         THE COURT:  Okay.  I get your point.

5         You're saying I'm hitting you for bad faith under

6    "1927" or, you know, whatever the phraseology here is; and

7    you're saying, in our review we have discovered, and you're

8    saying maybe or maybe not in the summary judgment it was so

9    effectively presented, but you're at least beyond the bad

10   faith issue.

11        MR. MANNING:  Well, and -- Your Honor, there's a

12   reason for the approach that we've taken here.

13        And the -- and it's my call that if the opposition

14   to the summary judgment -- in looking at all the records --

15   which we believed were computerized records -- given the fact

16   that the declarant is in Florida, the defendant is in Texas,

17   and everything -- and there are no originals to be seen, and

18   there -- there were no foundational statements along the

19   lines of the *Vinhee* case that established a foundation for

20   the ability of the defendant to confirm that these are

21   accurate records, that they -- that she knows how to access

22   the system.

23        I mean, these could be letters that were created,

24   but never sent.

25        We just don't know that.

1          And it was -- it was my decision to attack the MSJ,

2     to attack the evidence associated with the MSJ, principally

3     as a means of defeating it, with the thought that we now have

4     them committed to their January 19 letter that contradicts

5     the declaration of compliance and the documentation of

6     compliance, we now look pretty good for trial.

7          THE COURT:  Okay.

8          MR. MANNING:  And these are -- all the things that

9     I'm talking about here are things that can be verified by

10    looking at the notice of default and the declaration of

11    compliance attached to the notice of default, and also the

12    exhibits attached to the declaration of Cindy Ellis.

13         THE COURT:  Anything else on "1927"?

14         I was impressed with your argument that this

15    eviscerates "11."

16         If we were allowed "1927" to so facilely be

17    asserted, the protective aspects of Rule 11 disappear.

18         MR. MANNING:  I clearly agree with that.

19         THE COURT:  Yes.

20         MR. MANNING:  And would have an opportunity to

21    raise these issues in response to a proposed Rule 11 motion,

22    were it raised in that manner, and --

23         THE COURT:  Well, you've had a chance here --

24         MR. MANNING:  Yes, Your Honor.

25         THE COURT:  -- a chance you've taken on very

1        effectively -- to raise these issues.

2                Okay.  I will tell you my tentative now is that

3        you've survived "1927."  That part of the order disappears.

4                Now we're going to give the defense a chance to

5        reply, but I -- but we're not done yet.

6                MR. MANNING:  Yes, Your Honor.

7                THE COURT:  Requests for admissions are

8        troubling --

9                MR. HASHEMI:  (Nodded head.)

10               THE COURT:  -- and so let me tell you about the

11       requests for admissions.

12               I sometimes give panels on civil procedure with

13       other experts, and I say, you know, before every summary

14       judgment you should throw out some RFAs, get the usual

15       inadequate answers and ask for your fees after; and everyone

16       on the panel says, yeah, yeah, yeah, and no one ever does it,

17       in my 30 years.

18               It just doesn't happen.

19               And you go to an experienced business litigator and

20       he'll say "great idea," and I'll say, have you ever done it?,

21       and they say "no."

22               Okay.  So here, another very unique thing, they've

23       done it, and I've always wondered about the efficacy and

24       wisdom of doing what they did.

25       Is it a cheap and dirty way to introduce the English rule

1    into America?

2    Maybe so.

3    But it's there in the Code.

4    So this case -- interestingly, for the first time, I have to

5    say, in my 30 years as a business lawyer and my eight years

6    as a judge -- does what I've heard many experts say should be

7    done, seek fees following a summary judgment after RFAs were

8    filed and inadequately answered or denied under the Code.

9    So what do you say to all of that?

10         MR. MANNING:  Your Honor, I'm not going to disagree

11   with the principle.

12         I think my position is that the rule, because it is

13   an exception to the general rule, that it should be narrowly

14   applied; and so that -- and the -- and the court's request

15   for additional briefing as to what -- what exactly my

16   interpretation, what exactly is covered by these fee requests

17   under the RFAs, I think I'd like an opportunity, once that

18   briefing is completed, to address it, because I do think it

19   should be narrowly construed.

20         But --

21         THE COURT:  Why?

22         MR. MANNING:  But I don't -- because it's an

23   exception to the rule and otherwise --

24         THE COURT:  What rule?  The American rule?

25         The "what" rule?

1          MR. MANNING:  Well, the general concept that there

2     has to be a statute or a contract in place.

3          THE COURT:  That's the American rule.

4          MR. MANNING:  Yes, Your Honor.

5          And I think I reference case law -- although I'm

6     drawing a blank on the name of the case -- that -- that talks

7     about the narrow construction of that; and I also think that

8     there should be a -- a reasonableness component.

9          And I think that if the -- if the requests for fees

10    is more tailored to what had to be proven and whether -- and

11    how it relates to the fee request, then we could -- we can

12    oppose it more effectively.

13         So I -- I suppose -- I'd like to address the

14    additional briefing.

15         THE COURT:  Okay.

16         Let me say, also, I threw out the possibility of an

17    antideficiency argument protecting you.

18         Are you with me?

19         MR. MANNING:  Yes.

20         THE COURT:  I think that might apply in a "1927"

21    situation.

22         I don't see how it could possibly apply in a

23    discovery sanction in the course of litigation; otherwise,

24    there could be no sanctions against an

25    under-the-water Plaintiff.

1          Do you follow me?

2          MR. MANNING:  Yes.

3          THE COURT:  And I would apply that also to RFAs.

4          So I was concerned about deficiency arguments at

5     "1927" were they to ultimately go to a nonjudicial

6     foreclosure, which is likely where they would go.

7          I don't see such arguments on this discovery

8     matter.

9          I'm just telling you.

10         Otherwise, there would be no sanction in the course

11    of discovery for a Plaintiff suing for an underwater piece of

12    property.

13         MR. MANNING:  Your Honor, one point I would make,

14    Your Honor, because the court in its tentative in requesting

15    additional briefing on that issue made the point that there

16    would be no duplication of fees, and one area that is present

17    and that threatens that "duplication of fees" in the mortgage

18    loan servicing process is that mortgage loan servicers, even

19    when a borrow is not making payments, continue to -- continue

20    to be paid out of the tranche of other loans in the tranche

21    that are being paid.

22         THE COURT:  Whoa, wait a minute.

23         MR. MANNING:  So the servicer is paid.

24         The beneficiary is not paid, but the servicer is

25    paid; and, likewise, the servicer can make advances for

 1          different expenses and is compensated in -- in the industry.

 2                    I can't speak to this particular case --

 3                    THE COURT:  Okay.  I hear you.

 4                    Now, you talk about "further briefing."

 5                    I'm going from my memory here.

 6          I don't know that I was asking for "further briefing."

 7                    I'm asking for further evidence so that I could

 8          make a proper allocation or determination as to fees.

 9          Not so much legality or such evidence of such fees, but I

10          hear what you're saying about "further briefing."

11                    Anything further before we turn to Ms. Wong?

12                    MR. MANNING:  No, Your Honor.

13                    THE COURT:  Let me just say, at the moment, the

14          "1980" -- "1927" claim, I'm inclined to rule in your favor.

15                    I'm inclined to rule in your favor, because I don't

16          think there has been a sufficient showing.

17                    I do accept the arguments that this could undermine

18          Rule 11.

19                    It could undermine the American rule.

20                    And, Mr. Manning, it's kind of a pleasure to see

21          you here in court.

22                    MR. MANNING:  (Nodded head.)

23                    THE COURT:  We've seen your colleague a lot, and

24          he's done a decedent job; and I, Mr. Manning, am impressed

25          with the good faith and quality of your argument here.

1        If, ultimately, the tentative goes -- the final

2   order goes in your favor, I don't want you to be empowered by

3   such a ruling that "sloppiness is countenanced."

4        MR. MANNING:  Your Honor, I don't want to be back

5   here again under these circumstances ever.

6        THE COURT:  Okay.

7        If you dodge this bullet, there might be another

8   one.

9        Are you with me?

10        MR. MANNING:  Well, well with you.

11        THE COURT:  Okay.  Let me ask, how is your practice

12   going on foreclosure-related cases, which might be a --

13   something that could be heard all the way to the White House,

14   on whether we're out of the hole?

15        MR. MANNING:  What I'm finding -- I'm finding that

16   there are fewer newly-defaulting borrowers.

17        What I am finding with the

18   California Homeowners Bill of Rights is that as property

19   values have inched up somewhat and as the economy has

20   improved somewhat, although earning power isn't back, there

21   are a lot of borrowers that had given up, but who now -- now

22   see that -- you know, the light at the end of the tunnel,

23   perhaps, that, hey, this property isn't going down and down

24   and down and down.

25        It's coming back somewhat.

1          Maybe a spouse that was laid off is maybe back to

2    work -- maybe not paid as much -- but they've had these

3    change in circumstances and they want to approach the

4    servicer -- and the Homeowners Bill of Rights speaks directly

5    to this scenario -- and asks the servicer to be reevaluated

6    for foreclosure alternatives.

7          That's the largest segment of people that I'm

8    seeing right there.

9          THE COURT:  Could you make an argument on behalf of

10   your client that a wise businessman, which apparently your

11   client is, would do best to walk away from the property,

12   reinvest it in new money where he can start above water, than

13   below water, which he is, at the moment, and that he should

14   be commended for that?

15         MR. MANNING:  I have that conversation with every

16   client, just about, and the most difficult situation -- the

17   most difficult issue I face is that when the servicer comes

18   back and makes an offer to allow the client to stay in their

19   home -- and it's cheaper than rent -- it's attractive.

20         And, yet, they're substantially underwater, and

21   there's a real question in my mind of whether it makes sense,

22   whether they should just pull the Band-Aid off.

23         THE COURT:  Right.

24         Are they staying because it's their home or are

25   they staying because of a moral commitment not to walk away

1          from property?

2                    MR. MANNING:  Usually they're staying because it's

3          their home.

4                    THE COURT:  Okay.  Good.

5                    Interesting.

6                    Let's turn to Ms. Wong.

7                    MS. WONG:  Well, thank you, Your Honor.

8                    While Mr. Manning addressed the issue, I think he

9          raised all sorts of objections to the declarations and the

10         evidence that was presented in support of the motion for

11         summary judgment; but my recollection was that those

12         objections were overruled.

13                   And, also, Plaintiffs' attorney had ample

14         opportunity to do discovery if he wanted to challenge any of

15         that evidence, but no discovery was done.

16                   But I think the important thing about "1927" is --

17         is that the statute addresses an attorney who unreasonably

18         and vexatiously causes proceedings to be multiplied; and I

19         think, in this case, that occurred.

20                   As -- as this court knows, the plaintiffs presented

21         self-serving declarations in opposition to our motion for

22         summary judgment.

23                   Shortly after those declarations were prepared --

24         which was at the onset of the litigation -- they responded to

25         our requests for admissions and, for the most part, denied

1    all of the requests for admissions.

2         About a month after that, they then, in their

3    deposition testimony, presented contradictory testimony that

4    contradicted what they said in their declarations.

5         I think, at that point, when the deposition

6    testimonies were conducted, I think Plaintiffs' attorney

7    should have been aware at that time that the claims presented

8    by Plaintiffs were not supported by -- there was no factual

9    support, and these -- these were frivolous claims.

10        And I think regardless of the Rule 11

11   certification, I think there is sufficient grounds for

12   awarding fees under statute 1927.

13        THE COURT:  Okay.

14        Anything further?

15        MS. WONG:  With regard to the supplemental briefing

16   or presenting of evidence in support of the fees under

17   Rule 37, I just wanted the court to know that we are prepared

18   to present such further evidence or briefing within two weeks

19   of today's hearing, and probably sooner than that.

20        THE COURT:  All right.

21        Anything further?

22        MS. WONG:  That's it.

23        THE COURT:  All right.

24        Any replies?

25        MR. MANNING:  No, Your Honor.

1           THE COURT:  All right.

2           So I'm going to take the matter under submission.

3           Mr. Manning, again, if you were to prevail in the

4    ultimate order, I don't want to empower you to any further

5    "sloppy" conduct, and you acknowledge that.

6           MR. MANNING:  Yes, Your Honor.

7           THE COURT:  Not necessarily admitting that it's

8    "sloppy," but along the way, over this long ride since 2008,

9    sometimes -- and I can't really pinpoint it on you, because

10   there has been so many -- at times there has been performance

11   by Plaintiffs' counsel that left something to be desired.

12          Are you with me?

13          MR. MANNING:  Yes, Your Honor.

14          THE COURT:  And you don't want to be one of those.

15          MR. MANNING:  No, Your Honor.

16          THE COURT:  Okay.

17          I'm going to take the matter under submission.

18          On the further briefing, don't do any further work

19   on that until the final order comes out.

20          MS. WONG:  (Nodded head.)

21          THE COURT:  I'm going to issue this order on

22   Friday, one way or the other.

23          MR. MANNING:  (Nodded head.)

24          THE COURT:  As you leave, I want the two sides

25   just to talk.

1          MR. MANNING:   (Nodded head.)

2          THE COURT:   If you can reach some sort of

3    resolution, either for a small aspect of this case or the

4    entire case, let me know by Friday.

5          Okay?

6          MR. HASHEMI:   (Nodded head.)

7          THE COURT:   So just have discussions on the way

8    out.

9          We'll issue our final ruling in this fee matter on

10   Friday.

11         Since you're both here, talk on the way out.

12         Okay?

13         MR. MANNING:   Yes, Your Honor.

14         MS. WONG:   Thank you, Your Honor.

15         MR. HASHEMI:   Very good, Your Honor.

16      (End of proceedings.)

17                              ***

18                          Certificate

19         I hereby certify that the foregoing is a true and

20   correct transcript of the stenographically recorded

21   proceedings in the above matter.

22         Fees charged for this transcript, less any circuit

23   fee reduction and/or deposit, are in conformance with the

24   regulations of the judicial conference of the United States.

25                    /s/            DENISE PADDOCK
                      CMRS, RMR, CRR, CSR 10199